# CONTINUATION OF AN APPLICATION FOR A SEARCH WARRANT

I, Heather Williamson, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this continuation as part of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — specifically, one blue Apple iPhone and one blue Apple iPhone with a black case, as described more specifically in Attachment A ("the Subject Devices") — that is currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Devices, as described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since January 2013. I am currently assigned to the Grand Rapids District Office. Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and the Federal Bureau of Investigation ("FBI"), and composed of several other federal, state, and local agencies that is focused on the disruption of the Mexico-based Sinaloa Cartel. Prior to working as a DEA Special Agent, I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to avoid detection by law enforcement officials. I have investigated drug trafficking

organizations in relation to violations of federal laws such as unlawful importation of controlled substances, the distribution of controlled substances, manufacturing controlled substances, and possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, fentanyl, and other dangerous drugs, as well as money laundering.

3. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers.

4. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money laundering, as well as conspiracy and attempt to do the same, in violation of Title 18, United States Code, Sections 1956 and 1957.

5. I know from my training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions.  Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and

confederates. Mobile telephones are portable, and phone providers often do not require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement. Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of narcotics, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time. Wireless phones or smart phones also have the capability of facilitating monetary transactions relating to drug dealing, including through the use of cash or bank applications that allow for the electronic transfer of funds.

6. The information set forth in this continuation is based upon my personal knowledge and participation in the investigation described below, as well as information provided to me by other law enforcement officers. I have not set forth all of the information known to me or known to other law enforcement officers concerning this matter. This continuation is intended to show only that there is sufficient probable cause for the requested search warrant.

7. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically Title 21, United States Code, Sections 841 and 846, distribution and possession with intent to distribute controlled substances, and conspiracy to do the same, will be found on the Subject Devices, described in Attachment A. The categories of electronically stored information and evidence sought are described in Attachment B.

**IDENTIFICATION OF THE SUBJECT DEVICES TO BE SEARCHED**

8.     Subject Devices, namely, the properties to be searched, are one blue Apple iPhone and one blue Apple iPhone with a black case seized by law enforcement on June 16, 2022 from SHAQUILLE ROBINSON during a traffic stop of ROBINSON conducted in coordination with the DEA and the Michigan State Police ("MSP"). Subject Devices are currently located at a secure MSP facility within the Western District of Michigan.

9.     The applied-for warrant would authorize the forensic examination of Subject Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

10.    Since late 2019, the DEA, MSP, and the MSP-sponsored West Michigan Enforcement Team ("WEMET") have been investigating a network of individuals that coordinate drug trafficking activities, the movement of bulk cash, and the facilitation of street violence that frequently includes illegal firearms, assaults, and shootings in furtherance of gang violence in and around the area of Muskegon, Michigan.  This investigation has included the illegal activities of SHAQUILLE ROBINSON, whom investigators have learned is a crystal methamphetamine source of supply in Muskegon and Big Rapids, Michigan.

11.    Specifically, during the course of this investigation, law enforcement has learned that ROBINSON coordinates drug trafficking activity with other drug dealers in the Muskegon area, including by, but not necessarily limited to, using the

Subject Devices to facilitate drug deals. ROBINSON's criminal history includes state convictions for misdemeanor operating with a suspended license (2015), third degree retail fraud (2015), possession of marijuana (2017), operator/owner permitting another to violate motor vehicle code (2021), and felony possession of controlled substances – namely, cocaine and/or heroin less than 25 grams (2018).

12. Between January and April 2022, investigators conducted five controlled purchases from ROBINSON, for a total of more than 700 grams of crystal methamphetamine, as described in more detail below. Based on these buys, on June 6, 2022, a grand jury sitting in the Western District of Michigan returned an indictment charging ROBINSON with five counts of distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). *See* Case No. 1:22-cr-00077-PLM. Each of the five deals are summarized below:

### A. ROBINSON Distributes Crystal Meth on January 26, 2022

13. On January 26, 2022, a WEMET Undercover Officer ("UC") conducted a controlled purchase of approximately 56.6 grams of suspected crystal methamphetamine from ROBINSON. The UC contacted ROBINSON at (231) 769-5959 and arranged to purchase two ounces of crystal methamphetamine for $900. ROBINSON instructed the UC to meet him at the Roosevelt Apartments located at 525 W. Summit Ave in Muskegon. The UC waited for a period of time at the apartment complex until ROBINSON then instructed the UC to move locations, ultimately guiding him to a location on Lemuel Street in Muskegon. The UC observed ROBINSON walking southbound on Lemuel, at which time ROBINSON then got into

the UC's vehicle. The UC then exchanged $900 in pre-recorded WEMET buy money for approximately 56 grams of crystal methamphetamine. The coordination leading up to the controlled purchase and the UC meeting with ROBINSON were both audio recorded. The drugs were later weighed and field-tested as approximately 56.6 grams of methamphetamine.

### B. ROBINSON Distributes Crystal Meth on February 3, 2022

14. On February 3, 2022, the UC conducted a second controlled purchase of approximately 53.8 grams of crystal methamphetamine from ROBINSON. Again, the UC contacted ROBINSON at (231) 769-5959 and arranged to purchase "2 more zips" (what I know, based on my training and experience, to be coded language for two ounces of crystal methamphetamine) for $1000. At approximately 8:15 p.m., ROBINSON instructed the UC to meet him in the area of 8th Street and Norton Avenue in Muskegon. The UC observed ROBINSON driving Chevrolet Tahoe bearing Michigan registration EGR3978. No one else was inside the vehicle. ROBINSON subsequently parked near 8th Street and Oakwood Avenue and approached the UC's vehicle on foot. The UC exchanged $1000 pre-recorded WEMET buy money for what a DEA laboratory later confirmed to be 53.8 grams of crystal methamphetamine. Following the deal, ROBINSON got back into the Chevrolet Tahoe and drove to a location in Grand Rapids, Michigan. The UC meeting with ROBINSON was audio recorded.

15. On February 8, 2022, investigators obtained a State of Michigan search warrant to install a GPS tracker on the Chevrolet Tahoe that ROBINSON had

driven to the methamphetamine deal on February 3, 2022. Investigators installed the tracker on that same date. That warrant expired on March 7, 2022. However, on March 4, 2022, this Court authorized the continued tracking of the Chevrolet Tahoe. *See* 1:22-mj-123.

16. Also on February 8, 2022, investigators obtained a State of Michigan search warrant for GPS location data for (231) 769-5959, the cell phone number used by ROBINSON to arrange the deals. The warrant for the phone's GPS location data also expired on March 7, 2022. On March 3, 2022, this Court authorized a search warrant for the continued collection of GPS location data for (231) 769-5959. *See* 1:22-mj-118.

### C. ROBINSON Distributes Crystal Meth on February 10, 2022

17. On February 10, 2022, the UC conducted a controlled purchase of approximately 234.3grams of crystal methamphetamine from ROBINSON. Again, the UC contacted ROBINSON at (231) 769-5959 and requested to purchase 10 ounces of crystal methamphetamine. ROBINSON agreed to do the transaction later that day. Shortly thereafter, ROBINSON texted the UC from (231) 769-5959, and the following exchange occurred:

> ROBINSON: Hey bro I mistaken the price it normally will be 5 grand for 10 but I can do 45 instead of the 4.
>
> UC: Can we do 9 for the 4 then if that's straight?
>
> ROBINSON: Yeah that's fine.
>
> UC: I appreciate you man, call you when I get close.

ROBINSON:       Okay.

Based on my training, experience, and knowledge of this investigation, I know that the UC had originally requested to buy 10 ounces of crystal methamphetamine from ROBINSON for $4000. After initially agreeing to the deal, ROBINSON texted the UC and stated that he was mistaken and it would be "5 grand for 10" meaning $5000 for 10 ounces of crystal methamphetamine, but he could do "45 instead of the 4" meaning $4500 instead of $4000 for the 10 ounces. The UC then negotiated to purchase "9 for the 4" meaning 9 ounces of crystal methamphetamine for $4000. ROBINSON agreed.

18.     At approximately 7:00 p.m., the UC contacted ROBINSON at (231) 769-5959 via text message and stated, "leaving soon man, call you when I get close." ROBINSON responded, "okay, how long u thinkin," to which the UC stated "hour." At approximately 8:00 p.m., the UC contacted ROBINSON again at (231) 769-5959 and advised that he was getting close to the Muskegon area. ROBINSON instructed the UC to meet him at the Meijer parking lot in Norton Shores, Michigan. After a short time, ROBINSON called the UC from (231) 769-5959 and instructed the UC to park near the intersection of Temple Street and W. Maplewood in Muskegon Heights. When s/he arrived at the location, the UC recognized the Chevrolet Tahoe, previously driven by ROBINSON, approaching the UC's vehicle on Temple Street. The Tahoe parked door to door with the UC's vehicle, and the UC identified ROBINSON as the sole occupant of the Tahoe. ROBINSON proceeded to hand the UC a large Ziploc bag containing suspected crystal methamphetamine in exchange for $4000 pre-recorded

DEA buy money. Following the deal, ROBINSON drove away still in the Tahoe. The DEA laboratory later analyzed the drugs and determined that they were 234.3 grams of methamphetamine. The coordination leading up to the controlled purchase and the UC meeting with ROBINSON were both audio/text message recorded.

D. **ROBINSON Contacts the UC on (231) 769-5959**

19. From on or about February 17, 2022, until on or about February 28, 2022, ROBINSON contacted the UC through a series of text messages using (231) 769-5959. For example:



20.  Based on my training, experience, and knowledge of the investigation, I know that ROBINSON was reaching out to the UC on February 17 to inquire if the UC needed any narcotics ("did you need anything else bro") because he would be unavailable for the weekend.  Then again, on Monday, February 28, ROBINSON texted the UC from (231) 769-5959 asking if he's "been good bro," which I believe references whether or not the UC needs to make another purchase of narcotics or if he still has a quantity from the last purchase.

E.  **ROBINSON Distributes Crystal Meth on March 3, 2022**

21.  On March 3, 2022, the UC conducted a controlled purchase of approximately 184.4 grams of crystal methamphetamine from ROBINSON. Again, the UC contacted ROBINSON at (231) 769-5959 and requested to purchase 9 ounces of crystal methamphetamine. ROBINSON and the UC agreed to do the transaction later that day after dark.

22.  At approximately 7:50 p.m., the UC contacted ROBINSON via text message and informed him that s/he was on their way to Muskegon. At approximately 8:45 p.m., the UC contacted ROBINSON to inform him that s/he was in the area. ROBINSON stated that he would text the UC an address to meet him at.  Shortly thereafter, the UC also received a text message of an address in Muskegon.  At approximately 9:03 p.m., the UC arrived at the address, at which time the UC observed ROBINSON walk out from the vicinity of the residence, or from around the corner of the residence.  ROBINSON got into the passenger side of the UC vehicle,

and ROBINSON proceeded to hand the UC a large bag containing suspected crystal methamphetamine in exchange for $4000 pre-recorded DEA buy money.

23. ROBINSON told the UC that he "gets them in halves." Based on my training, experience, and knowledge of this investigation, I believe ROBINSON was referring to half-pound quantities, meaning 8 ounces or "in halves." I further believe this was ROBINSON's explanation to the UC for not having the full 9 ounces as previously agreed upon.

24. The DEA laboratory determined the drugs sold to the UC by ROBINSON were 184.4 grams of methamphetamine. The coordination leading up to the controlled purchase and the UC meeting with ROBINSON were both audio/text message recorded.

25. Following the deal on March 3, 2022, on March 17, 2022, at approximately 9:22 a.m., ROBINSON contacted the WEMET UC via text message to "checkin" and inform the UC that he would be out of town "in like a couple days".



26. Based on my training, experience, and knowledge of this investigation, I believe ROBINSON was contacting the UC to check on the status of his/her drug business. Specifically, if the UC were going to need to make another drug purchase in the next few days, ROBINSON would need to coordinate this drug transaction around his trip out of town.

    **F.**    **ROBINSON Distributes Crystal Meth on April 6, 2022**

27. Finally, on April 6, 2022, the UC conducted a controlled purchase of approximately 140 grams of suspected crystal methamphetamine from ROBINSON. Again, the UC contacted ROBINSON at (231) 769-5959 and requested to purchase 5 ounces of crystal methamphetamine. ROBINSON and the UC agreed to do the transaction later that day.

28. At approximately 8:30 p.m. on April 6, 2022, ROBINSON called the UC from (231) 769-5959 and advised him/her that ROBINSON was ready to do the deal. The UC texted ROBINSON stating s/he was in town. ROBINSON called the UC at approximately 9:41 p.m. and advised the UC that ROBINSON needed a little while to go get the crystal methamphetamine. ROBINSON again called the UC at 10:11 p.m. and stated he was ready to meet. ROBINSON instructed the UC to go to 2208 9th St in Muskegon Heights.

29. The UC arrived at 2208 9th St and parked on the west side of the roadway facing south. The UC did not observe anyone in the area. The UC called ROBINSON at (231) 769-5959 and advised ROBINSON s/he was outside and waiting. The UC stated it sounded like ROBINSON was inside a vehicle. While on the phone

with ROBINSON, the UC noticed a car, later determined to be a Dodge Charger, pull into the driveway of 2228 9th St. The UC noticed ROBINSON exit the passenger side of the Charger and walk towards the UC's vehicle. The UC drove towards ROBINSON and ROBINSON got into the passenger side of the UC's vehicle. The UC handed ROBINSON the $2000 of pre-recorded buy money in exchange for the suspected narcotics, which were packaged in a plastic bag. After the exchange, ROBINSON advised the UC to drop him off in close proximity to the Charger. The UC noticed ROBINSON walking towards the Charger as the UC left the area.

30. The drugs were later weighed and field-tested as approximately 140.2 grams of methamphetamine. The coordination leading up to the controlled purchase and the UC meeting with ROBINSON were both audio/text message recorded.

**G.  Additional Probable Cause**

31. Additionally, during the month of February 2022, DEA and WEMET investigators learned that the Mid-Michigan Investigative Narcotics Team ("MINT") had been conducting a drug trafficking investigation into a target known to them only as "SJ." Together, investigators subsequently identified that "SJ" was utilizing the (231) 769-5959 and a Chevrolet Tahoe . Investigators later confirmed that "SJ," was, in fact, ROBINSON.  According to MINT, ROBINSON is a primary source of supply of crystal methamphetamine in their area of responsibility, such as Big Rapids, Michigan.  MINT has conducted approximately three controlled purchases from ROBINSON utilizing a MINT Confidential Source ("CS") for a total of approximately 753 grams of crystal methamphetamine.

32. For example, on February 23, 2022, MINT detectives conducted a controlled purchase from ROBINSON utilizing CS-1[1] and CS-2[2]. MINT detectives searched CS-1 and CS-2 prior to the controlled purchase for money, contraband, and weapons with negative results. MINT detectives provided CS-1 and CS-2 with $2,100 of pre-recorded buy money. CS-1 and CS-2 contacted ROBINSON, who told them to meet at his residence located at 2912 Jefferson Street in the City of Muskegon. CS-1 and CS-2 traveled together to that address and parked in the driveway of the residence. A short time later, ROBINSON arrived in the same white Chevrolet Tahoe he used when delivering methamphetamine to the WEMET UC on several occasions. CS-1 then exited his/her vehicle and entered ROBINSON's vehicle, where the transaction took place. Following the transaction, CS-1 exited ROBINSON's vehicle,

---

[1] CS-1 has been providing information to law enforcement since February 2022. CS-1 has worked specifically as a MINT CS since approximately February 2022 and is a cooperating defendant working as a CS in the hopes for the dismissal of or leniency on drug charges. CS-1's criminal history includes state convictions for misdemeanor possession of marijuana, and embezzlement-agent or trustee less than $200. CS-1 has proven reliable through two controlled purchases resulting in the seizure of approximately 515 grams crystal methamphetamine, in addition to providing intelligence corroborated by MINT detectives.

[2] CS-2 has been providing information to law enforcement since February 2022. CS-2 has worked specifically as a MINT CS since approximately February 2022 and is a cooperating defendant working as a CS in the hopes for the dismissal of or leniency on a state charge. CS-2's criminal history includes a state conviction for misdemeanor possession of marijuana. CS-2 has proven reliable through one controlled purchase resulting in the seizure of approximately 222 grams crystal methamphetamine, in addition to providing intelligence corroborated by MINT detectives.

re-entered his/her vehicle and departed. Following the transaction, CS-1 and CS-2 traveled to a pre-determined location where they were searched again for money, weapons, and contraband with negative results. CS-1 and CS-2 turned over the purchased crystal methamphetamine to MINT Detective Nau and SA Frisch. The drugs were later weighed and field-tested as approximately 222 grams of methamphetamine.

### H.     Arrest of ROBINSON

33.     As noted above, on June 6, 2022, a grand jury sitting in the Western District of Michigan returned an indictment charging ROBINSON with five counts of distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). *See* Case No. 1:22-cr-00077-PLM. The Court subsequently issued a warrant for ROBINSON's arrest.

34.     Thereafter, on June 16, 2022, while conducting surveillance, WEMET Detectives located ROBINSON driving a 2021 Dodge Charger bearing MI registration plate ELA8699 traveling westbound on I-96. WEMET Detectives requested Deputy Paseka of the Muskegon County Sheriff's Office conduct a traffic stop the Charger and arrest ROBINSON for an outstanding DEA warrant for the distribution of crystal methamphetamine. Deputy Paseka stopped the Charger on westbound I-96 west of Sternberg Rd. Deputy Paseka then made contact with ROBINSON, who was the sole occupant of the vehicle. ROBINSON was taken into custody without issue.

35.     At the time of his arrest, ROBINSON was found to have $3,135 in United States currency in his pants pocket along with an Apple iPhone that was blue

in color (one of the two Subject Devices). While conducting an inventory search of the Charger, WEMET Detectives located a blue Apple iPhone with a black case in the center counsel (another one of the two Subject Devices). Both phones were seized and are the Subject Devices of this search warrant.

## **TECHNICAL TERMS**

36. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

 c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

 d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

 e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

 f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

37. Based on my training, experience, and research, I know that the Subject Devices have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, and GPS navigation devices. They also have the ability to connect to the Internet and were likely assigned Internet IP Addresses when connecting to the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and whether the device was used in furtherance of drug trafficking.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

38. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices. This information can sometimes be recovered with forensics tools.

39. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on Subject Devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

40. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

41. *Manner of execution.* Because this warrant seeks only permission to examine the Subject Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently,

I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

42. I submit that this continuation supports probable cause for a search warrant authorizing the examination of the Subject Devices described in Attachment A to seek the items described in Attachment B.